# United States Court of Appeals
## For the First Circuit

No. 06-2065

UNITED STATES OF AMERICA,

Appellant,

v.

BENJAMIN ESPINOZA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Torruella, Circuit Judge,
Selya and Cyr, Senior Circuit Judges.

Robert E. Richardson, Assistant United States Attorney, with
whom Michael J. Sullivan, United States Attorney, was on brief, for
appellant.
    Leslie Feldman-Rumpler for appellee.

June 13, 2007

**SELYA**, **Senior Circuit Judge**.  In this interlocutory appeal, the government challenges a suppression order entered in the United States District Court for the District of Massachusetts. It assigns error both to the district court's determination that an investigatory encounter was undertaken without reasonable suspicion and to the court's assessment of when a seizure occurred.  We have jurisdiction under 18 U.S.C. § 3731.

The district court made the challenged rulings after holding an evidentiary hearing and mulling the impact of a unique set of circumstances.  Judgments of this sort are notoriously fact-sensitive, and an appellate court should defer in large measure to the trial court's superior coign of vantage.  So it is here: although we, if sitting as a court of first instance, might not have drawn the same inferences from the underlying facts, we cannot say that the district court lacked the right to draw the inferences that it did.  Nor can we say that, given those inferences, the court abused its discretion in suppressing the evidence. Accordingly, we affirm the suppression order.

## I.  BACKGROUND

In this case, the defendant stands accused of conspiracy to transport, and the transportation of, illegal aliens.  See 8 U.S.C. § 1324(a)(1)(A)(ii), (a)(1)(A)(v)(I).  We begin our account with a concise summary of the events leading to those charges, as supportably found by the district court.  See United States v.

Romain, 393 F.3d 63, 66 (1st Cir. 2004); United States v. Lee, 317 F.3d 26, 30 (1st Cir. 2003).

On the morning of February 7, 2005, defendant-appellee Benjamin Espinoza was a front-seat passenger in a commuter van bearing Texas license plates that was traveling through Boston on Interstate 93. The van piqued the interest of Glen Fitzpatrick, an Immigration and Customs Enforcement (ICE) agent, who was en route to his office in an unmarked car.

Fitzpatrick was aware that, within the past year, Boston-based ICE agents had intercepted at least two similar extended-passenger vans engaged in the illegal transportation of aliens. Although the van had tinted windows, he could see the silhouettes of several persons (other than the driver and front-seat passenger) inside it. Consequently, he started following the van while at the same time contacting sector communications. This inquiry yielded information that the van was registered to Jesús Zendejas of Dallas, Texas. Fitzpatrick recognized Zendejas's name as having appeared on a suspect's telephone toll records in an earlier ICE investigation of human smuggling — an investigation that had not yet resulted in the filing of any criminal charges.

Fitzpatrick continued to follow the van surreptitiously for approximately twenty-five minutes. At around that time, the van left the expressway and proceeded on the Revere Beach Parkway. In due course, it pulled over and parked near a sandwich shop in

-3-

Everett, Massachusetts. The driver, Ambrosio Villareal, did not turn off the engine but let it idle. No one disembarked from the van.

Fitzpatrick parked his car some fifty feet away in an adjacent lot and approached the stopped van on foot. He wore civilian clothes and carried a holstered firearm. Upon reaching the van, he flashed his badge and identified himself to Villareal as an immigration officer. Speaking in Spanish, he requested identification. Villareal complied. Then Fitzpatrick, using a hand motion, "directed Villareal to shut off the engine." United States v. Espinoza, No. 05-10060, slip op. at 1 (D. Mass. June 15, 2006) (unpublished) (D. Ct. Op.). The identification that Villareal produced consisted of a Texas driver's license, an alien registration card, and a business card indicating his affiliation with a company called "Mi Tierra."

In approximately the same time frame, Fitzpatrick asked the defendant for identification.[1] The defendant proffered a Texas driver's license and, in response to a direct question, informed Fitzpatrick that he was a naturalized citizen. To buttress that

_____

[1]The government claims that the defendant volunteered information in English during Fitzpatrick's initial conversation with Villareal. This characterization is premised on Fitzpatrick's testimony that he recalls the defendant interjecting that he and Villareal were both employees of Mi Tierra. The district court appears not to credit this testimony. At any rate, even if we assume, favorably to the government, that this interjection occurred as Fitzpatrick described it, the result that we reach would not be affected.

-4-

statement, he showed Fitzpatrick a photocopy of his naturalization papers. A conversation ensued regarding Mi Tierra and the employment of Villareal and the defendant as drivers for that firm.

Fitzpatrick next turned his attention to the five passengers in the rear of the van. He questioned them in Portuguese and learned that three of the five had been arrested in Texas by border patrol officers on February 4, 2005 — three days earlier. All three had received notices to appear for removal proceedings. The other two men carried Brazilian passports but had no other identification. Upon completing this phase of his inquiry, Fitzpatrick read Villareal and the defendant their Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 444-45 (1966).

## II. STANDARD OF REVIEW

In examining the presence or absence of reasonable suspicion and the timing of a seizure, we deal with mixed questions of law and fact. Each of those questions requires a searching appraisal of the particular factual context.

As to the first issue — the existence vel non of reasonable suspicion — we must "assess the totality of the circumstances, on a case-specific basis, in order to ascertain whether the officer had a particularized, objectively reasonable basis for suspecting wrongdoing." United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006) (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)). The same is true of the seizure issue,

-5-

which necessitates careful consideration of "all the circumstances surrounding the encounter." <u>Florida</u> v. <u>Bostick</u>, 501 U.S. 429, 439 (1991).

Given the textured nature of these inquiries, appellate courts must proceed circumspectly and with regard for the district court's superior vantage point. <u>See</u> <u>United States</u> v. <u>Zapata</u>, 18 F.3d 971, 975 (1st Cir. 1994) (explaining that an appellate court reviewing the disposition of a suppression motion must "exhibit great respect for the presider's opportunity to hear the testimony, observe the witnesses' demeanor, and evaluate the facts at first hand"). Consequently, we will disturb the trier's factual findings only if they are clearly erroneous.[2] <u>See</u> <u>Coplin</u>, 463 F.3d at 100; <u>see</u> <u>also</u> <u>Reliance Steel Prods. Co.</u> v. <u>Nat'l Fire Ins. Co.</u>, 880 F.2d 575, 576 (1st Cir. 1989) (observing that disputes over facts are "the staples of a trial court's diet and comprise an unappetizing, usually unnourishing, bill of fare for appellate digestion"). In this process, credibility calls — with only rare exceptions — are the district court's prerogative. <u>See</u> <u>United States</u> v. <u>Rutkowski</u>, 877 F.2d 139, 144 (1st Cir. 1989). Legal conclusions, including ultimate constitutional determinations (such as the sufficiency of the facts as found to support a conclusion that, for example,

---

[2]A finding is clearly erroneous only when, upon a careful review of the record, a court is left with a "definite and firm conviction that a mistake has been committed." <u>United States</u> v. <u>U.S. Gypsum Co.</u>, 333 U.S. 364, 395 (1948).

reasonable suspicion exists or a seizure occurred), engender de novo review.  See Ornelas v. United States, 517 U.S. 690, 699 (1996); Zapata, 18 F.3d at 975.

We remain mindful throughout that when two or more legitimate interpretations of the evidence exist, the factfinder's choice between them cannot be deemed clearly erroneous.  See Romain, 393 F.3d at 70; see also Anderson v. City of Bessemer, 470 U.S. 564, 573-74 (1985).  Thus, if the district court chooses to draw a reasonable (though not inevitable) inference from a particular combination of facts, that inference is entitled to deference.  See Ornelas, 517 U.S. at 699.

## III.  ANALYSIS

We subdivide our substantive discussion of the district court's decision into two segments, corresponding to the government's twin lines of argument.

### A.  Reasonable Suspicion.

Typically, brief investigatory stops can be grounded on reasonable suspicion as opposed to, say, probable cause.  See Terry v. Ohio, 392 U.S. 1, 19 (1968); Zapata, 18 F.3d at 975.  That standard is not self-elucidating; we have warned before that the reasonable suspicion calculus "defies precise definition."  United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).  No prefigured mold or cookie-cutter design exists to delineate whether or not a law enforcement officer, at a given time and place, acted on the

-7-

basis of reasonable suspicion. Instead, that evaluation comprises "a fact-sensitive task, bound up in the warp and woof of the surrounding circumstances." Id. at 8.

Of course, precedent plays an important role in our system of justice, and the case law offers some general guidance. A finding of reasonable suspicion requires "'a particularized and objective basis' for suspecting the person stopped of criminal activity." Ornelas, 517 U.S. at 696 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). This particularity requirement means, in effect, that such a finding must be "grounded in specific and articulable facts." United States v. Hensley, 469 U.S. 221, 229 (1985); see United States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006). Moreover, the objective nature of the inquiry ensures that courts will focus not on what the officer himself believed but, rather, on what a reasonable officer in his position would have thought. Romain, 393 F.3d at 74.

Here, the government alleges that Fitzpatrick initiated the encounter with the van's occupants based on a reasonable suspicion of criminal activity, that is, a suspicion that they were engaged in the illegal transportation of undocumented aliens. The district court disagreed. It found, after hearing Fitzpatrick's testimony, that his rationale for following the van, approaching it, and commencing an investigation of the individuals within was bottomed on a pale patina of facts. These included: (i)

-8-

Fitzpatrick's observation of an extended-passenger van bearing Texas license plates traveling on a highway in Massachusetts; (ii) his awareness that the van was registered to Zendejas, whose name had surfaced (albeit not as a target) during a previous investigation for human smuggling; and (iii) his prior knowledge of the interception of "two and perhaps three similar passenger vans that were transporting illegal aliens" in the Boston area within the past year. D. Ct. Op. at 3. The district court commented that this patina, pale to begin with, faded even more in light of countervailing considerations such as Fitzpatrick's admission that the Boston area was not a place generally associated with the smuggling of illegal aliens and the fact that he observed nothing unusual or unlawful about the van's operation during his surveillance. Id. at 3-4. Indeed, the only "peculiarity" that Fitzpatrick had noted about the van "was that it bore Texas plates." Id. at 5.

Weighing the facts as a whole, the court concluded that Fitzpatrick's actions in approaching the van and starting to question its occupants were "based on nothing more than a hunch." Id. With specific reference to the Zendejas connection,[3] the court

_____

[3]Fitzpatrick testified on cross-examination that one of the previously intercepted vans was owned by Alfonso Garza, reputed to be a former business partner of Zendejas. The district court found that this information was new to the equation; Fitzpatrick did not know about this connection when he decided to follow and approach the van. See D. Ct. Op. at 3 n.2. That finding was not clearly erroneous.

added that the "tendrils of information known to Fitzpatrick about this individual [at the time of the encounter were] insufficient to transform the hunch into reasonable suspicion." Id. at 5-6.

The government does not claim any error in the district court's findings of raw fact. It does, however, attack with considerable ferocity the inferences drawn by the court from the facts as found. This attack overlooks that those inferences, too, are subject to clear error review. See Ornelas, 517 U.S. at 699; Zapata, 18 F.3d at 975. Using that barometer, our function is not to decide whether we, if sitting as arbiters of the facts, would have drawn the same inferences but, rather, to determine whether the district court's chosen inferences are plausible (and, thus, permissible) based on the raw facts as supportably found. See Romain, 393 F.3d at 70.

In this instance, we think that the district court's inferences, though not compelled by the facts, are nevertheless reasonable. Accordingly, they pass muster.

The requirement of reasonable suspicion as a basis for an investigatory stop reflects the core concerns of the Fourth Amendment. See Arvizu, 534 U.S. at 273. Here, Fitzpatrick approached the van endowed only with the scanty knowledge recounted by the district court. Given the nebulous nature of what he knew and the importance of the Fourth Amendment interests at stake, the court's conclusion that Fitzpatrick's actions were predicated on a

hunch, bereft of the particularity required for reasonable suspicion, was not clearly erroneous. See id. Put another way, the record yields no definite and firm conviction that the district court's conclusion was mistaken.

## B. Seizure.

Our validation of the lower court's finding that Fitzpatrick lacked reasonable suspicion at the outset of the encounter does not end our odyssey. In this case, the agent played no part in bringing the van to a halt; the driver stopped of his own volition and for his own reasons. Thus, even without reasonable suspicion, Fitzpatrick had a right to approach the parked vehicle and talk to its occupants if that interview was purely consensual. See United States v. Barry, 394 F.3d 1070, 1075 (8th Cir. 2005) (holding that the Fourth Amendment permits an officer to approach a parked vehicle without any show of force and question the occupants); see also United States v. Smith, 423 F.3d 25, 30 (1st Cir. 2005) (holding to like effect as to a pedestrian).

The district court found, however, that this encounter was not consensual because a seizure occurred at the point when Fitzpatrick ordered Villareal to shut off the engine. On that basis, the court granted the defendant's motion to suppress the statements made and papers produced in the interval between the command and the furnishing of Miranda warnings (including, of

-11-

course, the fruits of those revelations). We turn now to that finding.

The case law offers certain guideposts to assist in determining the nature of an encounter between law enforcement officers and civilians. Not every police-initiated conversation is a seizure. See, e.g., Smith, 423 F.3d at 30; Barry, 394 F.3d at 1075. Thus, a law enforcement officer does not trigger an individual's Fourth Amendment protections simply by approaching the person in public and asking routine questions. United States v. Drayton, 536 U.S. 194, 200-01 (2002); Smith, 423 F.3d at 30. The trigger point for Fourth Amendment purposes is the presence or absence of some cognizable coercion or constraint. See Drayton, 536 U.S. at 201 ("If a reasonable person would feel free to terminate the encounter, then he or she has not been seized."); United States v. Mendenhall, 446 U.S. 544, 554 (1980) (explaining that "[a]s long as the person to whom questions are put remains free to disregard the questions and walk away," Fourth Amendment protections are not implicated).

The test is objective: Would a reasonable person standing in the shoes of the individual who is approached have felt free to cease interaction with the officer and depart? Ornelas, 517 U.S. at 693; Smith, 423 F.3d at 28. If an objectively reasonable person would have felt compelled to stay, the encounter amounts to an investigatory stop in derogation of the defendant's constitutional

rights unless accompanied by, at the least, reasonable suspicion. See Terry, 392 U.S. at 21; Coplin, 463 F.3d at 100.

Here, the parties and the district court have framed the inquiry as a question of when the defendant was effectively seized by Fitzpatrick.[4] The government concedes that a seizure occurred at the point when Fitzpatrick informed the defendant of his Miranda rights. The defendant, however, places the seizure at an earlier step in the progression. The timing is of decretory significance because the evidence that the district court suppressed consisted mainly of statements made and documents tendered in the interval between these two moments in time.

The district court resolved this quandary in favor of the defendant. In doing so, the court relied upon the following facts: (i) Fitzpatrick, identifying himself as an ICE officer and wearing a holstered firearm, approached the van; (ii) he displayed his badge and began asking questions; and (iii) with a commanding tone and manner, he indicated that he wanted the driver to shut off the van's engine. D. Ct. Op. at 1-2. Although Fitzpatrick protested during the evidentiary hearing that the nonverbal command to shut off the engine was given solely to facilitate conversation, the

---

[4]In accepting this terminology, we do not imply any limitation on the doctrine that coercion, unaccompanied by reasonable suspicion, is constitutionally unacceptable. See Florida v. Royer, 460 U.S. 491, 498 (1983) (stating that an individual "may not be detained even momentarily without reasonable, objective grounds for doing so").

district court reasonably concluded that the absence of any evidence indicating that the van's occupants knew or intuited this unspoken limitation was extremely significant. See id. at 2 n.1.

In our view, this is a near-classic case of a set of facts that might — depending on the trier's interpretation — support either of two competing inferences. On the one hand, it seems plausible that a reasonable person in the defendant's shoes might have considered the encounter consensual and non-custodial. On the other hand, it seems equally plausible that a reasonable person in the defendant's shoes might have felt constrained to remain seated in the stopped van and to respond to the agent's queries. The district court concluded that the latter interpretation was the more likely scenario and, thus, ruled that Fitzpatrick had effectively seized the defendant when he ordered Villareal to shut down the engine. Because this inference from the facts as found was not clearly erroneous, the district court did not err in ordering suppression. See United States v. Ladd, 885 F.2d 954, 957 (1st Cir. 1989) (cautioning that appellate courts should not intrude when "a trier chooses among plausible (albeit competing) inferences").

In a last-ditch effort to turn the tide, the government argues that this case is controlled by our decision in Smith. In our view, however, these two cases are not fair congeners. In Smith, the district court determined that a seizure had occurred

when two police officers exited their cruiser, approached the defendant on a public street, and asked him for identification. 423 F.3d at 27. We reversed the district court's consequent grant of a motion to suppress because the historical facts as found by the court did not support a reasonable inference that the defendant had been seized. Id. at 30. The court's inference flew in the teeth of well-settled law that police officers who do no more than approach individuals without a show of authority and ask routine questions will not be held to have generated a sense of coercion. Id. at 29-30.

Here, unlike in Smith, the officer did more than merely approach and propound routine questions. According to the district court, which made a supportable factual finding in this regard, Fitzpatrick commanded the driver to shut off the engine. See D. Ct. Op. at 2, 4. That command, in the circumstances of this case, may not have compelled a finding of coercion but it supports such a finding (and, thus, a finding that a seizure occurred then and there).

## IV. CONCLUSION

We need go no further. The district court's conclusion that a seizure occurred, unaccompanied by reasonable suspicion, is consonant with the facts as found and with the record. Accordingly, we uphold the district court's order suppressing the evidence in question.

-15-

**Affirmed**.